UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ROBERT LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00297-JPH-DLP |
| | ) | |
| M. MITCHEFF, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Denying Motion to Strike Sur-reply
and Granting Motion for Summary Judgment**

Robert Lee brings this action under 42 U.S.C. § 1983 alleging deliberate indifference to his serious medical needs. The defendants are two prison employees who reviewed his grievances, five medical professionals, and the two corporations responsible for providing medical care at Indiana Department of Correction facilities. Presently before the Court is a joint motion for summary judgment filed by the five medical professionals and two corporations (collectively the "medical defendants") and their motion to strike Mr. Lee's sur-reply and designated evidence.

For the reasons that follow, the Court **denies** the medical defendants' motion to strike Mr. Lee's sur-reply, dkt. [123], and their requests to strike certain evidence designated by Mr. Lee, *see* dkt. 115 at 6 and dkt. 116 at 1-2, and **grants** their joint motion for summary judgment, dkt. [90].

## I. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its burden, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). A disputed fact is material if it might affect the

outcome of the suit. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## II. Facts and Background

### A. Parties

Mr. Lee has been incarcerated at Wabash Valley Correctional Facility ("Wabash Valley") since early 2013. Dkt. 90-8 at 3. He asserts claims against several medical professionals: Dr. Mitcheff, Dr. Byrd, Dr. West-Denning, Nurse Hobson, and Nurse Riggs,[1] *see* dkt. 7 at 2-3, and corporations: Corizon LLC and Wexford of Indiana, LLC. *Id.*

Corizon and Wexford are private corporations that contracted with the Indiana Department of Correction to provide medical services to individuals incarcerated at Wabash Valley from 2013 to 2019. Dkt. 90-5 at 1-2. Corizon's contract ended on March 31, 2017, and Wexford's contract began on April 1, 2017. *Id.* All the individual medical professionals worked for Corizon, Wexford, or both. Dkt. 90-2 at 1; dkt. 90-3 at 1-2; dkt. 90-4 at 1-2; dkt. 90-5 at 1; dkt. 90-6 at 1.

---

[1] Mr. Lee included a defendant identified as "Albright" in his complaint. Dkt. 2 at 2. Those claims were dismissed without prejudice after the Court could not identify or serve process on this defendant. Dkt. 99. In his response, Mr. Lee identifies this defendant as "Wright." Dkt. 112 at 3. The Court will not consider any claims against Wright because she was not named in the complaint or served with process, and Mr. Lee has not sought relief from the order dismissing without prejudice all claims against "Albright."

Dr. Mitcheff has been the Regional Medical Director for Wexford since July 1, 2018. Dkt. 90-5 at 1. Dr. Byrd and Dr. West-Denning are physicians who worked at Wabash Valley during the time relevant to Mr. Lee's complaint. Dkt. 90-2 at 1-2; dkt. 90-6 at 1. Nurse Riggs is a registered nurse who provided care to Mr. Lee, dkt. 90-3 at 1-2; and Nurse Hobson is a registered nurse who served as the Health Services Administrator at Wabash Valley, dkt. 90-4 at 1-2.

**B. Mr. Lee's Initial Requests for Medical Treatment of Hernia**

Mr. Lee first received treatment for his hernia in March 2014. Dkt. 109-1 at 42-46. The doctor noted that Mr. Lee had a periumbilical hernia that was reducible[2] and advised that he would "consider surgical consult if [Mr. Lee's] pain persists." Dkt. 109-1 at 44-46. While Mr. Lee filed health care requests related to his hernia over the next several months, they were not handled by the medical professionals named as defendants in this case. *Id.* at 51-52, 60; dkt. 90-1 at 169-174.[3]

In September 2014, Mr. Lee complained that his hernia was hurting. Dkt. 109-1 at 67. Nurse Riggs met with Mr. Lee two days after he submitted his health care request, and she scheduled Mr. Lee to see a doctor. *Id.* at 72-74. The doctor advised against using an abdominal binder because the hernia was "stable" in size. *Id.* at 75-77. He did not try to reduce the hernia, and he told Mr. Lee "to avoid excessive manipulation" of it. *Id.* at 75.

Medical providers addressed Mr. Lee's hernia again during a chronic care visit in April 2015. Dkt. 90-1 at 146-150. Dr. Byrd described the hernia as "large" and noted that there was no history of incarceration, that the hernia was "painful when standing, coughing, sneezing, or having [a bowel movement]," and that Mr. Lee previously had not used an abdominal binder. *Id.* at 146.

---

[2] "A reducible hernia is one that is not incarcerated upon examination and can be returned . . . back into the abdomen in a normal anatomic location." Dkt. 90-2 at 3. An incarcerated hernia "is one that has become restricted by the abdominal muscles." *Id.*

[3] Mr. Lee also submitted the medical records from an appointment during this period, but the copy he provided appears to be incomplete. *See* dkt. 109-1 at 55-57.

An abdominal binder was ordered for Mr. Lee, likely by Dr. Byrd, shortly after this appointment. Dkt. 90-2 at 6 (Dr. Byrd affidavit); dkt. 90-1 at 146-150 (medical records from appointment with Dr. Byrd); dkt. 109-1 at 100-102 (medical records documenting measurement for and issuance of abdominal binder). After receiving the abdominal binder in June 2015, Mr. Lee did not complain about his hernia for two years.

### C. Mr. Lee's Renewed Requests for Medical Treatment of Hernia

In early July 2017, Mr. Lee advised a nurse that his hernia had gotten larger and that he feared another hernia had developed. Dkt. 112-1 at 1-3. The nurse referred Mr. Lee for an appointment with a doctor because the hernia was red and painful. *Id.* at 2. She also gave Mr. Lee "Tylenol to hopefully help with the pain." *Id.* Two days after this appointment, Dr. Byrd provided verbal orders that it was "impossible" for Mr. Lee to develop a second hernia on top of the original hernia and advised that Mr. Lee's hernia could be "addressed at chronic care." *Id.* at 4-5. Mr. Lee was directed to inform medical staff if his hernia became incarcerated. *Id.* at 5.

At the end of July, Mr. Lee again complained of a painful hernia. Dkt. 109-1 at 147. Nurse Riggs met with Mr. Lee, educated him on how to properly wear the abdominal binder, and referred him for an appointment with Dr. Byrd. *Id.* at 147-148. After examining him in early August 2017, Dr. Byrd requested an off-site general surgeon evaluation of Mr. Lee's hernia. *Id.* at 153-156; dkt. 90-2 at 7. But after discussing Mr. Lee's case with Dr. Kuenzli, the regional medical director, it was decided that "other treatment such as activity restrictions and as needed pain medication could work to alleviate Mr. Lee's symptoms." Dkt. 90-2 at 7; dkt. 109-1 at 157. They based their decision on the facts that Mr. Lee's hernia remained reducible and he continued to wear his abdominal binder. Dkt. 90-2 at 7.

After receiving inquiries from Mr. Lee's family and the Indiana Department of Correction contract monitor regarding Mr. Lee's medical care, Dr. Byrd requested an ultrasound of Mr. Lee's abdomen "to ensure no complications from the massive size of the hernia." Dkt. 109-1 at 158-159. Although the hernia was large, there was "no evidence of bowel loops within the hernia sac." *Id.* Rather, the hernia "most likely contain[ed] fatty mesentery." *Id.* Medical staff responded to Mr. Lee's subsequent health care request asking when his hernia would be fixed by stating: "Not scheduled for surgery because hernia is not incarcerated. You have fat in the hernia." *Id.* at 162.

Dr. Byrd again consulted with Mr. Lee concerning his hernia at a chronic care visit in October 2017. He explained that Mr. Lee's hernia contained mesenteric fat rather than bowel loops, and Mr. Lee agreed to try Tylenol and a properly fitting abdominal binder to treat the hernia. *Id.* at 163-167. Mr. Lee received a different abdominal binder, *id.* at 168, and did not complain about his hernia again until May 2018.

**D. Mr. Lee's Subsequent Requests for Medical Treatment of Hernia**

In May 2018, Nurse Riggs referred Mr. Lee to Dr. West-Denning after Mr. Lee submitted a health care request stating that his hernia was causing a lot of discomfort. Dkt. 109-1 at 209-213. Mr. Lee reported to Dr. West-Denning that he had no pain at that time and stated the hernia was "bothersome" four to five times a month. *Id.* at 215-219. Dr. West-Denning noted the size of Mr. Lee's hernia and the characteristics that "place[d] him in a higher risk category for poor wound healing after a surgery of any kind." *Id.* at 218. She also documented that Mr. Lee's "significant central obesity" created a "risk for recurrence of hernia after hernia repair." *Id.* Given these considerations, Dr. West-Denning requested a collegial call to discuss Mr. Lee's case. *Id.*; *see also id.* at 220-224.

Dr. Kuenzli, Dr. Byrd, and Dr. West-Denning discussed Mr. Lee's hernia and decided to manage it on-site at Wabash Valley. Dkt. 109-1 at 225. Although Mr. Lee's hernia was now non-reducible, the doctors determined that Mr. Lee was "unlikely to be [a] good surgical candidate" because of the "risk for skin breakdown due to comorbidities." *Id.*

Mr. Lee filed two health care requests in June 2018 asking for updates concerning his hernia. Dkt. 109-1 at 228-229. Medical staff informed him that the request for hernia surgery was not approved. *Id.* In response, Mr. Lee filed several grievances, which resulted in an appointment with Dr. Byrd in September 2018. *Id.* at 230-235.

At this appointment, Dr. Byrd directed Mr. Lee to continue using the abdominal binder. Dkt. 109-1 at 239-241. He also agreed to re-submit a request for surgery to repair Mr. Lee's hernia. *Id.* at 241. He noted: "[Mr. Lee] is not an ideal candidate, but hernia is no longer reducible." *Id.* For unknown reasons, medical staff did not submit the request for approval to send Mr. Lee for a surgical consult until November 2018, two months after Mr. Lee's appointment with Dr. Byrd.[4] *Id.* at 256-259; dkt. 90-2 at 8-9.

Initially, Dr. Mitcheff denied this request for a surgical consult. Dkt. 109-1 at 261. He noted that Mr. Lee needed to lose weight and recommended other measures to treat the hernia. *Id.* He also instructed medical staff to resubmit the request if the hernia became incarcerated. *Id.* Two days after Dr. Mitcheff's denial, Dr. Byrd submitted another request explaining that Mr. Lee's hernia was incarcerated. *Id.* at 262-265. Dr. Mitcheff approved the request the next day. *Id.* at 266.

**E. Dr. Tapia's Medical Treatment of Mr. Lee's Hernia**

---

[4] Mr. Lee filed a grievance on November 1, 2018, inquiring as to whether he had been approved for a surgical consult. Dkt. 109-1 at 247.

Mr. Lee met with Dr. Tapia, an off-site general surgeon, in December 2018. Dkt. 90-1 at 32-33; dkt. 90-2 at 9. Dr. Tapia recommended surgery to repair Mr. Lee's hernia and remove his gallbladder. Dkt. 90-1 at 32-22; *see also* dkt. 109-1 at 267-269. Dr. Mitcheff approved the recommendations, dkt. 109-1 at 273, and Dr. Tapia conducted the surgery on February 14, 2019, *id.* at 274-275.

### F. Mr. Lee's Post-Operative Medical Treatment

Mr. Lee was discharged from the infirmary on February 19, 2019, after his hernia and gallbladder surgery. Dkt. 112-1 at 6-7.

Within five days, Mr. Lee filed a health care request stating he had a "bulge" where he had surgery. *Id.* at 8. Medical staff met with Mr. Lee, examined the area of concern, and contacted Dr. Tapia for further instructions. *Id.* at 9-11. Per Dr. Tapia's orders, Nurse Riggs instructed Mr. Lee to use a warm compress on his abdomen. *Id.* Dr. Tapia also recommended a follow-up appointment. *Id.* at 9.

In early March 2019, Mr. Lee filed two health care requests stating it felt like his "guts are being ripped apart."[5] *Id.* at 13-14. Shortly after, he met with Dr. Tapia who recommended continuing to use the warm compress, wearing the abdominal binder at all times, and restricting heavy lifting. *Id.* at 15-18. A doctor at Wabash Valley reiterated Dr. Tapia's recommendations to Mr. Lee a few days after the follow-up appointment. *Id.* at 19-22. The doctor also informed Mr. Lee that the surgical seroma—the bulge that occurred after surgery—would be "spontaneously absorbed." *Id.* at 21.

---

[5] He also filed a health care request asking for an extension of his medical lay-in. Dkt. 112-1 at 12. This request was granted. *Id.*

Because the seroma grew in size and caused pain, Mr. Lee submitted two more health care requests asking to see a doctor. Dkt. 112-1 at 23-24. Nurse Riggs examined Mr. Lee and advised him that he needed "to be up walking." *Id.* at 25-26. Dr. Byrd also saw Mr. Lee and explained how the seroma would be absorbed. *Id.* Nurse Riggs and Dr. Byrd met with Mr. Lee again a month later and noted that the seroma was decreasing in size. *Id.* at 27-30. Dr. Tapia noted the same when he met with Mr. Lee for a second follow-up appointment. *Id.* at 31. When Mr. Lee met with medical staff in late April 2019, he did not "complain of any abdominal symptoms." *Id.* at 32-34.

Mr. Lee did not complain about his hernia again until August 2019, after he filed this action. Dkt. 112-1 at 46. He was eventually diagnosed with another hernia in November 2019. *Id.* at 58-61.

### G. Medical Expert

The medical defendants have submitted an affidavit from Dr. Paul Szotek in support of their request for summary judgment. Dkt. 90-7. Dr. Szotek is a former general surgeon who now serves as the Chief Executive Officer and Director of the Indiana Hernia Center. *Id.* at 1. He opines that the individual medical professionals "acted within the standard of care" with regards to Mr. Lee's hernia. *Id.* at 2. He also opines that "Mr. Lee required only conservative treatment for his hernia up and until his surgical repair" in February 2019 and that "[a]dopting a watchful waiting approach is appropriate" when treating reducible hernias in patients who are morbidly obese and have no risk of strangulation of internal organs. *Id.* Dr. Szotek states that waiting and recommending weight loss is appropriate treatment of a reducible hernia because "operating on [a] hernia in morbid obese patients not at risk for organ incarceration is fraught with complications and risks of recurrence outweigh the benefit of repair." *Id.* at 3.

Dr. Szotek further states that it was Mr. Lee's weight and the pressure his weight placed on his abdomen, not the abdominal binder, that caused Mr. Lee's hernia to grow. *Id.* He believes the best treatment for Mr. Lee's hernia, pain, and related symptoms was weight loss and that over-the-counter medications were appropriate to control Mr. Lee's pain until he could control his weight. *Id.* at 3-4. Finally, Dr. Szotek opines that the seroma that occurred after the surgery was "not caused by any act, omission, or delay" of medical staff at Wabash Valley. *Id.* at 4.

### III. Analysis

Mr. Lee claims that the medical professionals were deliberately indifferent to his serious medical needs. With respect to Corizon and Wexford, he alleges that their policies or practices caused him to receive constitutionally deficient medical care.

#### A. Deliberate indifference

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The medical defendants do not contest that Mr. Lee suffered from a serious medical condition so the only issue is whether the medical professionals were deliberately indifferent to Mr. Lee's hernia.[6]

"As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "[T]he evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to

---

[6] Although Mr. Lee also challenges the medical care he received from medical professionals other than the named defendants, the Court limits its analysis to the parameters of the claims asserted, that is, the medical care provided by the named defendants.

an inmate's health." *Id.* Medical professionals are afforded "a great deal of deference in their treatment decisions," and "a constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (cleaned up) (finding no deliberate indifference when "each defendant responded to [the inmate's] complaints and exercised their medical judgment in evaluating his hernia and reported pain"). "When a plaintiff's claim focuses on a medical professional's treatment decision, 'the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

### 1. Nurse Hobson and Nurse Riggs

Mr. Lee alleges that Nurse Hobson and Nurse Riggs were deliberately indifferent because they did not respond to his complaints of pain. *See* dkt. 2 at 5-6. The designated evidence shows otherwise.

Nurse Hobson interacted with Mr. Lee three times related to his hernia: (1) in August 2017 when she submitted a request for an ultrasound, dkt. 109-1 at 158-159; (2) in June 2018 when she responded to a health care request from Mr. Lee, dkt. 109-1 at 229; and (3) in November 2018 when she investigated a grievance filed by Mr. Lee, dkt. 109-1 at 249. In August 2017, Nurse Hobson implemented orders from Dr. Byrd. Dkt. 109-1 at 159. In June 2018, she explained why the most recent request for an off-site evaluation was denied. *Id.* at 229. In November 2018, she investigated Mr. Lee's complaint, found that an earlier request for an off-site evaluation had been denied, and renewed the request for an off-site evaluation. *Id.* at 249. No reasonable jury could conclude that Nurse Hobson disregarded a substantial risk to Mr. Lee's health.

Additionally, no reasonable jury could conclude that Nurse Riggs disregarded a substantial risk to Mr. Lee's health. The record establishes that Nurse Riggs exercised her medical judgment when evaluating Mr. Lee and referred him to see a medical provider on many occasions. Nurse Riggs first met with Mr. Lee in September 2014 when he complained that his hernia was painful. Dkt. 109-1 at 72-74. She evaluated Mr. Lee and referred him to a doctor. *Id.* She also issued an abdominal binder per doctor's orders in April 2015. *See* dkt. 90-1 at 142-145; dkt. 90-2 at 5-6.

Two years later, when Nurse Riggs received a health care request from Mr. Lee in July 2017, she evaluated him and referred him for an appointment with a doctor. Dkt. 109-1 at 147-148. She took these same steps when Mr. Lee filed a health care request in May 2018. *Id.*at 209-213. Finally, when Mr. Lee filed health care requests after his hernia surgery, Nurse Riggs sought treatment from doctors on his behalf. Dkt. 112-1 at 10-14, 24-30.

Mr. Lee contends that Nurse Riggs falsified various medical records when she noted Dr. Byrd's presence at two medical visits in March and April of 2019. Dkt. 112 at 18. Mr. Lee's apparent basis for this claim is that Dr. Byrd traditionally works as the "WVCF Northside medical provider while Dr. Rajoli is the WVCF Southside medical provider." *Id.* Regardless of which doctor provided care during these visits, Mr. Lee's unsworn statement regarding the alleged error does not establish that Nurse Riggs deliberately falsified Mr. Lee's medical records, nor does it support Mr. Lee's deliberate indifference claim. *See Estate of Williams v. Ind. State Police*, 26 F. Supp. 3d 824, 837 (S.D. Ind. 2014) ("It is well settled that unsworn statements, including expert reports, are inadmissible to support or oppose summary judgment.").

Because no reasonable jury could conclude that Nurse Hobson or Nurse Riggs were deliberately indifference to Mr. Lee's serious medical needs, they are entitled to summary judgment.  *See Johnson v. Dominguez*, 5 F.4th 818 (7th Cir. 2021).

11

### 2. Dr. Byrd, Dr. West-Denning, and Dr. Mitcheff

Mr. Lee alleges that Dr. Byrd, Dr. West-Denning, and Dr. Mitcheff were deliberately indifferent when they issued an abdominal binder that worsened the hernia, delayed an off-site evaluation of his hernia, and ignored his complaints of pain. *See* dkt. 2 at 8. But the designated evidence shows that they responded to and actively treated Mr. Lee's hernia.

Dr. Byrd issued an abdominal binder when Mr. Lee's hernia started to grow, *see* dkt. 90-2 at 5-6, and Mr. Lee did not seek additional treatment for his hernia until two years later. Although Mr. Lee asserts that it was unreasonable to issue an abdominal binder to treat a hernia that was not reduced, dkt. 112 at 32-33, he has not designated evidence to support his assertion. His statements alone are insufficient to overcome the testimony offered by Defendant's expert. See *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference in opinion as to how a condition should have been treated does not give rise to a constitutional violation."). Also, Mr. Lee cannot establish that Dr. Byrd knew that Mr. Lee's hernia was becoming worse as a result of the abdominal binder because Mr. Lee did not complain about or seek treatment for his hernia for two years.

When Mr. Lee began complaining about his hernia in July 2017, Dr. Byrd initially submitted a request for evaluation by an off-site general surgeon, but ultimately changed course after discussing the case with Dr. Kuenzli Mr. Lee's case. Dkt. 109-1 at 157; dkt. 90-2 at 7. Dr. Byrd and Dr. Kuenzli determined that it was unnecessary to refer Mr. Lee for an off-site evaluation because Mr. Lee used the abdominal binder and his hernia remained reducible. Dkt. 109-1 at 157; dkt. 90-2 at 7. Instead, Dr. Byrd requested an ultrasound of the hernia, which showed that it was fat, not bowel loops, within the hernia. Dkt. 109-1 at 158-159. When Dr. Byrd discussed this finding with him, Mr. Lee agreed to use pain medication to treat the hernia symptoms and did not file another health care request for several months. *Id.* at 163-167, 209-213.

Dr. Byrd next examined Mr. Lee in September 2018, and he sought approval for an off-site evaluation upon learning that Mr. Lee's hernia was no longer reducible. Dkt. 109-1 at 239-241. Although the request was not timely submitted, Mr. Lee has presented no evidence that Dr. Byrd caused the delay, and it is undisputed that Dr. Byrd continued requesting an off-site evaluation until it was approved. *Id.* at 239-241, 262-265.

Finally, Dr. Byrd did not display deliberate indifference when treating the seroma that developed after Mr. Lee's hernia surgery. Rather, he responded to Mr. Lee's complaints, examined the affected area, and consulted with the off-site surgeon concerning treatment. Dkt. 112-1 at 25-30.[7] Mr. Lee has identified no steps that Dr. Byrd should have taken to avoid the seroma, nor has he submitted evidence to suggest that Dr. Byrd's treatment of the seroma was inappropriate.

Ultimately, what matters for a claim of deliberate indifference is "the totality of an inmate's medical care." *Petties v. Carter*, 836 F.3d 722, 727−28 (7th Cir. 2016) (en banc); *Kaszuba v. Ghosh*, 580 F. App'x 486, 488 (7th Cir. 2014) ("[I]solated incidents of delay [do] not rise to the level of deliberate indifference."). No jury could find from the designated evidence that Dr. Byrd was deliberately indifferent to Mr. Lee's hernia. Accordingly, Dr. Byrd's request for summary judgment is granted. *See Johnson v. Dominguez*, 5 F.4th 818 (7th Cir. 2021).

Dr. West-Denning treated Mr. Lee's hernia on one occasion. After examining him, Dr. West-Denning requested a collegial call to discuss Mr. Lee's case. In the medical records from her examination, she noted not only the size of Mr. Lee's hernia but also the characteristics that "place[d] him in a higher risk category for poor wound healing after a surgery of any kind." Dkt. 109-1 at 215-219. Dr. West-Denning noted factors that weighed both in favor of and against hernia

---

[7] As noted *supra* at 11, there may be some dispute about which doctor actually saw Mr. Lee on this occasion. However, if it was not Dr. Byrd, he certainly cannot be held liable for any injury sustained as a result.

surgery, and she asked to discuss the options with other medical providers in order to reach a well-reasoned treatment decision. Dkt. 90-6 at 4. No reasonable jury could conclude that Dr. West-Denning disregarded a substantial risk to Mr. Lee's health so her motion for summary judgment is granted.

Dr. Mitcheff did not become involved in Mr. Lee's medical care until November 2018 when Dr. Byrd submitted a request for an off-site evaluation. Although Dr. Mitcheff originally denied the request and recommended Mr. Lee lose weight, dkt. 109-1 at 261, he reconsidered and approved the request two days later when Dr. Byrd clarified that Mr. Lee's hernia was no longer reducible, *id.* at 266. Because Dr. Mitcheff reconsidered his denial of the request for an off-site evaluation after Dr. Byrd clarified the facts of Mr. Lee's case, no reasonable jury could conclude that Dr. Mitcheff disregarded a serious risk to Mr. Lee's health. Dr. Mitcheff's request for summary judgment is granted.

### B. Because Mr. Lee has not shown a violation of his constitutional rights, his claims against Corizon and Wexford must fail.

Mr. Lee asserts claims against Corizon and Wexford, asserting that their policies or practices caused him to receive constitutionally deficient medical care. Dkt. 2 at 3. Corizon and Wexford contend that summary judgment should be granted because Mr. Lee suffered no constitutional violation and he has presented no evidence of other patients who also received insufficient medical care. Dkt. 91 at 31-35. As explained below, Corizon and Wexford are entitled to summary judgment.

Although Corizon and Wexford are private entities, they act under color of state law and therefore may be liable for damages under § 1983 only on "evidence that a [] policy, practice, or custom caused" the constitutional violation alleged. *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). However, Mr. Lee "must establish that he suffered a deprivation of a

federal right before [private entity] fault, deliberate indifference, and causation come into play."

*First Midwest Bank Guardian of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021).

Mr. Lee's claims against Corizon and Wexford fail because he has not established that he suffered a violation of his constitutional rights. Without a constitutional violation, he cannot proceed on his claims against Corizon and Wexford, and they are entitled to judgment as a matter of law. Their request for summary judgment is **granted**.

### IV. Conclusion

For the reasons explained above, the medical defendants' joint motion for summary judgment, dkt. [90], is **granted**. The claims against Nurse Hobson, Nurse Riggs, Dr. Byrd, Dr. West-Denning, Dr. Mitcheff, Corizon, and Wexford are **dismissed with prejudice**.

The motion to strike plaintiff's sur-reply, dkt. [123], is **denied**. Consideration of the documents identified in the motion to strike, dkt. 123, and the separate reply briefs, dkt. 115 at 6 and dkt. 116 at 1-2, does not prejudice the medical defendants.

Final judgment consistent with this Order, the order granting the motion for summary judgment filed by defendants Littlejohn and Wellington, dkt. [127], the order dismissing without prejudice claims against defendant Albright, dkt. [99], and the screening order, dkt. [7], shall now issue.

**SO ORDERED.**

Date: 9/28/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

ROBERT LEE
226365
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Michael J. Blinn
INDIANA ATTORNEY GENERAL
michael.blinn@atg.in.gov

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov